**CONTINUATION OF SEARCH WARRANT APPLICATION**

I, Alexis J. Giudice, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **956-455-3372** (hereinafter, "**Target Cellphone 1**"), and a cellular telephone assigned call number **956-459-5954** (hereinafter "**Target Cellphone 2**") or collectively ("the **Target Cellphones**") that is stored at premises controlled by **SPRINT PCS/T-MOBILE US, INC.**, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require **SPRINT PCS/T-MOBILE US, INC.** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am Special Agent with the Drug Enforcement Administration ("DEA"), a position I have held since August 2015. As part of my duties, I investigate criminal violations of the federal drug trafficking laws. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. I have received training in the area of drug

investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in investigations that have led to the issuance of search warrants involving violations of drug laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives; storage facilities; smartphones; and computers. Evidence searched for, and recovered, in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

3. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods, which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug-trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives; storage facilities; smartphones; and computers. Evidence searched for, and recovered, in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

5.     I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods, which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug-trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives; storage facilities; smartphones; and computers. Evidence searched for, and recovered, in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a) and 846 (Possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy to commit the same) have been committed by JASON DUENAS, JOSE PARTIDA and other unknown persons. There is also probable cause to search the information described in

Attachment A for evidence, fruits, and instrumentalities of these crimes as further described in Attachment B.

## PROBABLE CAUSE

8. Since May 2022, agents and officers from the DEA Grand Rapids District Office ("GRDO"), and the West Michigan Enforcement Team ("WEMET") have been conducting this joint investigation into the cocaine trafficking activities Jason DUENAS and Jose PARTIDA. A WEMET Confidential Source ("CS") provided phone number 956-455-3372[1] (hereinafter referred to as "**Target Cellphone 1**") as Jason DUENAS's phone number.

9. On June 6, 2022, a WEMET CS placed a recorded phone call to DUENAS on **Target Cellphone 1** and had the following conversation regarding cocaine as the direction of law enforcement:[2]

    CS:             ….But my guy called me and he wants to know what's up. He only wants one though bro but he said he wants a piece to check it out.

---

[1] In May 2022, investigators served an administrative subpoena on SPRINT PCS/T-Mobile regarding phone number 956-455-3372, which revealed subscriber information of "Joe Dirt, 52 W 19th Street, Holland, MI 49423." On June 7, 2022, the Honorable Judge Vern Helder authorized a State of Michigan GPS ping warrant on phone number 956-455-3372, which became operational on the same date. During the course of the GPS ping warrant, investigators conducted both physical and electronic surveillance in which the movements of the GPS ping locations matched the movements of DUENAS.

[2] Due to the length of this call, the transcript includes the pertinent sections of the conversation.

| | |
|---|---|
| DUENAS: | Okay. Okay. Well this is the thing, is that, I have it coming. It's on the way. Um… |
| CS: | Okay. |
| DUENAS: | Cause' what I got right now is, you know what I mean I just broke into my last one over the weekend but… |
| CS: | Oh did you? |
| DUENAS: | You know what I mean? And the thing about it, those, I don't know if it's going to be the same exact material. I mean everything is kind of a little bit different. So… |
| CS: | Yeah, yeah. |
| DUENAS: | What I would prefer to do is kind of, when these next ones come in, you know I could break one open and take a piece out of that and give it to him. You know what I'm saying, I don't want to give him a piece of what I got right now and then it be, you know, different. |
| CS: | Yeah, the dude, yeah. Yup. It needs to be what he is going to get. So… |
| DUENAS: | Yeah and the shit about it is you know everything is good man. I don't pass on no bullshit. |
| CS: | Yeah. |
| DUENAS: | You know what I'm saying. |
| CS: | Yup. |
| DUENAS: | So it's going to be good no matter what but like I said, you know some of them come a little softer, some of them will come a little harder, you know what I'm saying. |
| CS: | Yup, yup. |
| DUENAS: | I prefer to give him what he's going to get. So I should be getting good like no later by Wednesday Thursday. I believe. So… |

5

| | |
|---|---|
| CS: | No later than Wednesday Thursday. |
| DUENAS: | Yeah… |
| CS: | He's good bro, he's good. I did business with him before man like, like he's bought three, the most I've sold him is three but cash bro but he, you know the price has to come down a little bit but right now he said he wants one cause' I told him, like what you had like told me, you didn't know if you had two, you know what I mean so… |
| DUENAS: | Yeah. |
| CS: | So he's like nah bro if he just got the one, I'll take the one but if you get enough, if you get enough, he'd probably take two. You know what I mean? |
| DUENAS: | Yeah that's not a problem. |
| CS: | That won't be a problem? |
| DUENAS: | Nah it won't be a problem bro, as long as he's cash ready you know what I'm saying. I ain't got no time for… |
| CS: | Yeah cash up bro. Yup. |
| DUENAS: | Alright. |
| CS: | Yup. He got a money counter and… |
| DUENAS: | That will work. |
| CS: | …everything right there bro. That way it don't even take long or nothing. I just need to get a good piece and I could pay you for it if you want you know what I mean just to take it to him… |
| DUENAS: | Yeah. |
| CS: | …because he's going to end up cooking it. You know what I mean. |
| DUENAS: | Yeah that's not a problem |

| | |
|---|---|
| CS: | So he can check it out and then boom. And then once it's a go, then we'll just meet up bro, meet up at my crib or, or wherever. |
| DUENAS: | Okay. |
| CS: | You know if you want to go to your crib, whatever, wherever. You know we'll just count everything up… |
| DUENAS: | Okay, yeah. |
| CS: | …everything is usually all, all counted up and all in thousands you know what I mean. |
| DUENAS: | Yeah that won't be an issue bro. Well you tell him that bro, you tell him to give me just a couple more days, like I said, just a couple more days. And then I'll have whatever, you just caught be towards the end but… |
| CS: | no, no, there ain't no, there ain't no rush. I'll let him know. Cause' usually, he just, he waits for me. He don't really fuck with nobody else, you know what I mean? |
| DUENAS: | Yeah, yeah, yeah. |
| CS: | Usually he'll just come get them from me. Right now my people don't, right now my people aren't moving around right now. So you're my only bet, you know what I mean? |
| DUENAS: | Okay, well just tell him to give me a couple more days and I'll be ready as soon as it touches my hand, as soon as it touches my hand, I'll give you a call and then you know, I'll send somebody your way with the little piece and then you can go ahead and do whatever you need to do with it and then you give me a call back. As long as everything is good we can set up a time bro. |
| CS: | Yeah. Hell yeah. Hell yeah. Alright bro. I'll let him know today. |
| DUENAS: | Okay, just expect my, expect my call bro within the next couple of days I got you. |

7

    CS:                In the next couple of days?

    DUENAS:       Yeah, for sure. One hundred percent.

10. On June 13, 2022, a WEMET CS had the following recorded text message conversation with DUENAS using **Target Cellphone 1**:

    CS:                Qua onda bro? Whats up carnal can you give me a call

    DUENAS:       In Texas, be back soon.

11. On July 1, 2022, a WEMET CS received the following recorded text message from DUENAS using phone number 956-459-5954[3] (hereinafter referred to as "**Target Cellphone 2**"):

    DUENAS:       Yo just got back in town from vacation. I can send my boy wit that sample but I need that balance soon already bro

12. On July 6, 2022, a WEMET CS placed a recorded phone call to DUENAS on **Target Cellphone 2** in order to purchase a sample of cocaine. During the communications, DUENAS agreed to meet the CS in Holland, Michigan. On the same date, WEMET detectives met with the CS at a pre-determined meet location, searched the CS' person and the CS's vehicle, which yielded negative results for contraband. WEMET detectives then provided the CS with Official Advanced Funds ("OAF") to purchase the

---

[3] On July 1, 2022, investigators served an administrative subpoena on SPRINT PCS/T-Mobile regarding phone number 956-459-5954, which revealed subscriber information of "Joe Dirt, 52 W 19th Street, Holland, MI 49423" and an activation date of June 24, 2022.

sample of cocaine. WEMET detectives maintained constant surveillance on the CS as the CS traveled to the pre-determined meet location to obtain the sample of cocaine.

13. On the same date, WEMET detectives established surveillance on the residence of DUENAS, located at 13735 Carmella Lane, Apartment F, Holland, Michigan. At approximately 7:31 p.m., WEMET detectives observed Jose PARTIDA, exit DUENAS's residence and enter a gray Dodge Charger. WEMET continued surveillance on the vehicle driven by PARTIDA as it traveled directly to the pre-determined meet location the CS was located at. WEMET detectives then observed PARTIDA meet briefly with the CS before returning to his gray Dodge Charger. WEMET detectives continued surveillance on PARTIDA as he traveled to his residence located at 125 W. 16th Street, Holland, Michigan.

14. On the same date, WEMET detectives also continued surveillance on the CS as the CS traveled back to a pre-determined meet location following the interaction with PARTIDA. Upon meeting, the CS immediately produced the sample of cocaine to detectives. [4] The CS's person and vehicle were searched by detectives, which yielded negative results.

15. On July 11, 2022, a WEMET CS placed a recorded phone call to DUENAS on **Target Cellphone 2** in order to purchase 9 ounces of cocaine for approximately $7,500. On the same date, members of WEMET and DEA GRDO met with the CS at a pre-

---

[4] A Michigan State Police Laboratory later determined the substance to be cocaine.

determined meet location, searched the CS's person and the CS's vehicle, which yielded negative results for contraband. Investigators then provided the CS with $7,500 OAF to purchase the 9 ounces of cocaine.

16. Prior to the transaction, members of WEMET and DEA GRDO established surveillance on 125 16th Street, Holland, Michigan, the residence of PARTIDA and 13735 Carmella Lane, APT F, Holland, Michigan, the residence of DUENAS. At approximately 4:44 p.m., WEMET detectives observed DUENAS exit 13735 Carmella Lane, APT F and enter a 2019 white GMC Terrain, bearing Michigan plate: 4FNY12. Surveillance continued with DUENAS's vehicle as it left the apartment complex parking lot and traveled to 125 16th Street, Holland, Michigan, the residence of PARTIDA. Members of WEMET and DEA GRDO observed PARTIDA exit the residence holding a brown paper bag and enter the passenger side seat of DUENAS's Terrain. Members of WEMET and DEA GRDO then observed DUENAS's Terrain exit the driveway of PARTIDA's residence and travel back to DUENAS's residence located at 13735 Carmella Lane.

17. In the presence of investigators, the WEMET CS made contact with DUENAS on **Target Cellphone 2** to confirm the location of the narcotics transaction. During the recorded call, DUENAS advised that the transaction would occur at 981 Butternut Drive, at the Santa Fe Mexican store. DUENAS further advised that he needed to pick up his "boy," who would be conducting the narcotics transaction on behalf of DUENAS. Investigators searched the CS's person and the CS's vehicle, which yielded

negative results for contraband. Investigators then provided the CS with Official Advanced Funds ("OAF") to purchase the 9 ounces of cocaine.

19. The WEMET CS was then followed by investigators as the CS traveled to the Santa Fe Mexican Store, located at 981 Butternut Drive, Holland, Michigan. Members of WEMET and DEA GRDO further established surveillance around the location.

19. At approximately 5:49 p.m., members of WEMET observed PARTIDA exit 13735 Carmella Lane, APT F with the same brown paper bag he was seen in possession of when PARTIDA was picked up earlier by DUENAS at PARTIDA's residence. Surveillance then observed PARTIDA enter the driver's seat of DUENAS's white Terrain and exit the parking lot. Surveillance continued with PARTIDA as he drove in DUENAS's vehicle to 981 Butternut Drive, arriving at approximately 5:54 p.m. Members of surveillance observed PARTIDA park near the CS's vehicle. Surveillance then observed the CS enter DUENAS's white Terrain for approximately 10 minutes prior to exiting the vehicle holding the same brown paper bag. Surveillance then observed the CS re-enter the CS's vehicle and exit the parking lot.

20. Investigators maintained surveillance on the CS as the CS traveled back to a pre-determined meet location following the interaction with PARTIDA. Upon meeting at the pre-determined meet location, the CS immediately produced the brown paper bag

which contained approximately 9 ounces of cocaine.[5] The CS's person and vehicle were searched by investigators, which resulted in negative results for contra-band. The CS advised that during the meeting with PARTIDA in DUENAS's vehicle, PARTIDA requested that the CS count the $7,500 in front of PARTIDA to confirm the money was all accounted for. The CS advised that after counting the money, PARTIDA gave the CS the brown paper bag containing the cocaine.

21.     On July 11, 2022, approximately a few hours after the above described controlled purchase, members of WEMET and DEA GRDO executed a State of Michigan search warrant at 13735 Carmella Lane, Apartment F, Holland, Michigan, the residence of Jason DUENAS. Prior to the execution of the search warrant, the Ottawa County Sheriff's Office conducted a traffic stop of a vehicle containing DUENAS, placed DUENAS into custody for safety during the execution of the search warrant and transported DUENAS back to his residence located at 13735 Carmella Lane, Apartment F, Holland, Michigan.

22.     During the search of the residence, investigators located:

    a. approximately 19 kilograms (including packaging) of a substance that field-tested positive (Tru-Narc) for cocaine,[6] packaged into 14

---

[5] The Drug Enforcement Administration North Central Laboratory determined the substance to be cocaine.

[6] The Drug Enforcement Administration North Central Laboratory determined the substances referenced in subsections A-F to be cocaine.

    bundles, located in the laundry room inside of the washer and the dryer as well underneath both the washer and the dryer;

b. approximately 346.2 grams (including packaging) of a substance that field-tested positive (Tru-Narc) for cocaine, packaged into separate plastic bags, located in the main level bathroom closet within a safe;

c. Approximately .83 grams (including packaging) of a substance that field-tested positive (Tru-Narc) for cocaine, packaged in one bag, located in the main floor bathroom closest inside of a safe;

d. Approximately 145.49 grams (including packaging) of a substance that field-tested positive (Tru-Narc) for cocaine, packaged into 6 separate bags, located in the main level bathroom closet within a money counter box;

e. Approximately 69.65 grams (including packaging) of a substance that field-tested positive (Tru-Narc) for cocaine, packaged into 3 separate bags, located in the kitchen in a cabinet;

f. Approximately 5.02 grams (including packaging) of a substance that field-tested positive (Tru-Narc) for cocaine, packaged in one bag, located in the kitchen within a cabinet;

g. a "ghost" handgun, containing no serial number or manufacturer markings, with no magazine within the handgun, located in the kitchen in a cabinet;

h. a Ruger EC9S 9mm handgun, bearing an obliterated serial number, located in the kitchen in a cabinet;

i. an extended magazine containing approximately 26 rounds of 9mm ammunition, located in the main level bathroom closet safe;

j. two boxes of 9mm ammunition containing approximately 25 rounds in one box and 15 rounds in the other box, located in the laundry room on a shelf;

23. In my training and experience, I have learned that **SPRINT PCS/T-MOBILE US, INC.** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities

that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

24. Based on my training and experience, I know that **SPRINT PCS/T-MOBILE US, INC.** can collect cell-site data about the **Target Cellphones**. I also know that wireless providers such as **SPRINT PCS/T-MOBILE US, INC.** typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. The cell site data regarding the **Target Cellphones** retained by **SPRINT PCS/T-MOBILE US, INC.** will allow investigators to more fully establish a pattern of activity associated with the user or users of the phone, believed to include JASON DUENAS. This data will also allow investigators to potentially identify co-conspirators

with whom the user or users of the **Target Cellphones** met and to potentially identify the movement of the proceeds of drug trafficking.

25. Based on my training and experience, I know that wireless providers such as **SPRINT PCS/T-MOBILE US, INC.** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as **SPRINT PCS/T-MOBILE US, INC.** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cellphones** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

26. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

27. I further request that the Court direct **SPRINT PCS/T-MOBILE US, INC.** to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on

**SPRINT PCS/T-MOBILE US, INC.**, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.